1
2
3
4
5
6
7
8

## UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10

11 | ELROY WILLIAM ROBINSON,

12 |                    Petitioner,

13 |    v.

14 | CHARLES CALLAHAN, Warden

15 |                Respondent.

Case No.:  3:19-cv-0387-BAS-MSB

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY**

16
17
18

## I.     INTRODUCTION

19

Petitioner Elroy William Robinson ("Petitioner" or "Robinson"), a state prisoner proceeding pro se, filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, challenging his San Diego Superior Court conviction in case number SCS266818. ("Pet.," ECF No. 1.)[1]  The Court has reviewed the Petition, the Answer and Memorandum of Points and Authorities in Support of the Answer, the Traverse, the lodgments, and all the supporting documents submitted by both parties.[2]  For the reasons discussed below, the

---

[1] Page numbers for docketed materials cited in this order refer to those imprinted by the court's electronic case filing system.

[2] Although this case was randomly referred to United States Magistrate Judge Michael S. Berg pursuant to 28 U.S.C. § 636(b)(1)(B), the Court has determined that neither a Report and Recommendation nor oral argument are necessary for the disposition of this matter.  See S.D. Cal. Civ. L.R. 71.1(d).

Court **DENIES** the petition and **DENIES** a certificate of appealability.

## II.     FACTUAL BACKGROUND

Because Robinson pleaded guilty and did not file a direct appeal, there is no state court decision outlining the facts of this case.  Accordingly, the Court summarizes the facts as set forth in the San Diego County Probation Department's Sentence Report, as follows:

> On [August 28, 2013], a National City Police Department School Resource Officer (SRO) responded to Ira Harbison Elementary School to investigate a report by [9-year-old] C.G., the victim.  She claimed her stepfather, Elroy Robinson, the defendant, molested her on numerous occasions.
>
> The victim told her teacher, that the defendant had sexually abused her between 2009 and 2011.  The school psychologist spoke with the victim and was told the same information.  The teacher told the Officer her conversation with the victim.  The victim appeared upset and told the teacher she was sad.  She explained she was sad because of a unique family situation and did not want the teacher to tell the victim's mother, [Mrs.] Robinson.  The victim said her stepfather abused her, but she stopped because they talked to him and said to stop.  The teacher asked her what she meant by abuse and the victim asked if she wanted her to tell her what he did.  The teacher told the victim she could tell her as little or as much as she wanted.  The teacher asked if words or touching could be abuse.  The victim said yes to both and when the teacher asked her where are you not supposed to touch, the victim said, "My private parts.  Please don't tell my mom."  The victim was very upset, physically shaking and crying.
>
> The psychologist told the Officer the victim told him that the defendant sexually abused her and that it started in Florida.  She did not know how many times but that it was more than once.  She explained he touched her "private parts" with "his privates" and it hurt[,] and she would cry.  She said it sometimes happened in the bathroom.  The victim explained she told her mother about the abuse when they lived in Florida and her mother spoke to the defendant.  The victim heard the defendant tell her mother he did not see her as his daughter.
>
> Following the report, the victim and her two siblings, ages one and two, were taken into the custody of Child Protective Services.  A Detective called

2

Mrs. [Robinson, the mother of the victim,] and advised her all three of her children had been placed in protective custody. Mrs. Robinson was calm and said she understood. The Detective asked if she could meet the next day at the police station. She agreed to appear with her husband, the defendant.

On [August 29, 2013], the defendant, Mrs. Robinson[,] and [a] Navy Lieutenant appeared at the police station. . . . Mrs. Robinson told the Detective she first learned of the molestation the week before Christmas 2012. By this time[,] she and the defendant had moved to San Diego. The victim seemed sad and Mrs. Robinson confronted her and asked what was wrong. The victim ultimately disclosed that the defendant had been touching her vagina and orally copulating her. Mrs. Robinson discussed with the victim what the consequences would be if the molestation was reported to the police. She said her siblings would be taken away and the defendant would be taken to jail. She [stated that Petitioner] was the only source of income for the family. Mrs. Robinson then asked the victim what she wanted to do. She said she would confront the defendant and make sure the molestation would not happen again. After talking with the victim[,] they agreed to keep the molestation in the family.

Two days later Mrs. Robinson confronted the defendant. He admitted to molesting the victim. He was honest with her and admitted to touching and orally copulating the victim. He admitted it started in December 2009 when she was six years old. Mrs. Robinson asked the defendant why he molested the victim and he said, "I don't see her as my daughter." He admitted to touching her last in April 2012.

The next day the family discussed how to proceed forward. The defendant asked for the victim's forgiveness, and she did. They all agreed to not report the molestation to the police. Mrs. Robinson placed "precautions" she believed would help the victim feel safe. She would not allow the victim to dress in light clothing, she was to always have on pants and a top and she was to lock her bedroom door.

In January 2013, the victim's father visited and asked if the victim could return to Belize to live with him. Mrs. Robinson agreed[,] and the victim lived with her grandfather in Belize for three months. The defendant did not know she was leaving and was upset. In April 2013, Mrs. Robinson visited Belize and the victim asked if she could return to the United States. Mrs. Robinson brought her back.

Mrs. Robinson had not sought counseling for the victim and did not report it to the police. She told the Detective she should have reported the molestation to the police, but did not want to break up her family and loose [sic] the only source of income they had.

After interviewing Mrs. Robinson, the Detective met with the defendant and asked if he wanted to meet. The defendant said, "I am here to do the right thing." The Detective informed the defendant that he was free to leave at any time prior to the interview.

The defendant explained when he and Mrs. Robinson married[,] the victim was five years old. Approximately a year later he began to molest her. He described the first incident as being in the bathroom while bathing the victim. It occurred while living in military housing in Florida in December 2009. He gave the victim a bath and he touched her vagina. He said he got pleasure from touching and fondling the victim's vagina.

The second incident occurred two weeks later when he laid in bed with the victim. He explained the victim did not like to fall asleep by herself so he would lay with her until she fell asleep. The defendant touched the victim's vagina and fondled it. It was over her clothing. The third incident was a re-occurrence of the second incident.

The fourth incident occurred in the living room when the victim was watching television. The defendant sat next to her, put his hand down her pants and touched her vagina with his bare hand. The victim said, "Stop. Why are you doing this? I am going to tell." He described the fifth incident as occurring three months later and was a re-occurrence of the fourth. Several days after the fifth incident a sixth occurred comparable to the fifth. Again, the victim asked him to "Stop" and not touch her.

The defendant could not describe each and every incident but that most of the time he would touch and fondle her. It continued until October or November 2013. Prior to their move to San Diego he would have the victim sit on his lap while wearing boxers (or sometimes pants) and move her around. This stimulated the defendant and caused him to obtain an erection. The defendant told the Detective the victim could feel his erection while he would move her around on his lap. While doing this the defendant would touch the victim's vagina and buttocks. The defendant would stop and stand the victim up. He would turn the victim around and then kiss her on the mouth. He would put his tongue in the victim's mouth.

When they moved to San Diego[,] he continued to molest the victim and would touch her in her bedroom and in the living room.  The defendant explained the victim told him she had viewed pornographic material.  He Googled pornographic video clips and showed them to her.  Initially the defendant said he did this to make sure what she said she had viewed was indeed pornographic material.  However, after further questioning, the defendant admitted he had shown it to her on more than one occasion to see how she would react.  The defendant said he showed the victim women on women in sexual positions and completing sexual acts.

The defendant described an occasion when he inserted his pinkie finger into the victim's vagina.  When he did[,] she told him it hurt so he pulled it back out.  He estimated he only placed the tip of his pinkie in her vagina.  He detailed an incident in June 2011, just prior to his deployment, when he took the victim into the bathroom and turned off all the lights.  He removed her pants and panties and orally copulated her.  While copulating the victim, the defendant said he touched her buttocks.

When he returned from deployment in February 2012, he continued to molest the victim.  He said, "I could not stop myself."  He detailed an incident that took place in March 2012, when he inserted his erect penis into the victim's vagina.  He stopped when she told him it hurt.  He said he was only able to insert the "tip" of his penis.  The defendant attempted to lie about his actions.  He told Mrs. Robinson that he never placed his penis into her vagina.  He attempted to convince her it was his pinkie again.

The defendant said he was ashamed of what he had done, but he could not stop himself.  He said he would never molest one of his own children, as it would be "gross."

The defendant was arrested and booked into jail.  The defendant wrote an apology letter to the victim.

Additionally, the Detective received a telephone call from the Commanding Officer of the USS Wayne Meyer.  He said he had information regarding the defendant.  He said the defendant contacted him on [August 28, 2013] and briefed him regarding his children being removed from his custody.  On the morning of [August 29, 2013], the defendant met with the Commanding Officer and disclosed he had molested his stepdaughter.  He told the Commanding Officer "he was ready to face the consequences."

(Lodgment 2, ECF No. 15-2 at 2–5.)

## III.   PROCEDURAL BACKGROUND

On September 3, 2013, the District Attorney issued a criminal complaint charging Robinson with one count of sexual intercourse/sodomy with a child 10 years old or younger (Cal. Penal Code § 288.7(a) (count one)); one count of oral copulation/sexual penetration with a child 10 years old or younger (Cal. Penal Code § 288.7(b) (count two)); three counts of committing a lewd act upon a child (Cal. Penal Code § 288(a)) (counts three, four and nine)); one count of sending harmful matter with intent of seduction of a minor (Cal. Penal Code § 288.2(a) (count five)); and three counts of committing a forcible lewd act upon a child (Cal. Penal Code § 288(b)(1) (counts six, seven and eight)).  (Lodgment No. 1, ECF No. 15-1 at 1–2.)

Robinson was appointed a public defender who began working on a motion to suppress Petitioner's confession.  Petitioner then retained new counsel who took over the case, and prepared and filed the motion to suppress on March 27, 2014.  (*See* Lodgment No. 11, ECF No. 15-11, Ex. D at 46–47.)  On April 16, 2014, the trial court denied the motion to suppress and the prosecution subsequently offered Robinson a plea bargain.  (*See id.* at 17.)  That same day, Robinson pleaded guilty to counts three, four, six, seven, eight, and nine.  (*Id.* at 167; *see also* Lodgment 3, ECF No. 15-3.)  The plea agreement contained a stipulated sentencing range of twenty-four to thirty years, to be determined by the sentencing court.  (Lodgment 11, ECF No. 15-11 at 167.)  On July 2, 2014, the court sentenced Robinson to a total term of thirty years in prison.  (Lodgment 3, ECF No. 15-3; *see also* Lodgment 4, ECF No. 15-4 at 1.)

On June 28, 2017, Robinson filed a petition for writ of habeas corpus with the San Diego Superior Court alleging his due process rights were violated when:  (1) he was allegedly detained beyond the state statutory forty-eight hour limit until arraignment, (2) the trial judge allegedly acknowledged concerning behavior surrounding Robinson's confession but nonetheless improperly denied his motion to suppress, and (3) the sentencing judge was allegedly rude and condescending towards Petitioner, demonstrating

improper bias against him.  (*See* Lodgment 5, ECF No. 15-5 at 3–4.)  On August 1, 2017, Robinson's petition for writ of habeas corpus was denied because he failed to state a prima facie claim for relief, waived his claim of unlawful detention by not bringing a motion pursuant to California Penal Code § 995, waived his claim regarding the motion to suppress by pleading guilty, and the sentence was within the stipulated range of the plea.  (Lodgment 6, ECF No. 15-6 at 1–2.)

On September 14, 2017, Robinson filed another petition for writ of habeas corpus with the San Diego Superior Court, alleging he received ineffective assistance of counsel when defense counsel failed to raise the issue of Robinson's unlawful detention, failed to adequately argue the motion to suppress, and improperly pressured him to enter into the guilty plea.  (Lodgment 7, ECF No. 15-7 at 3.)  On October 24, 2017, the Superior Court denied the petition, concluding that Petitioner's claims constituted an improper piecemeal attack on his conviction and as such, were procedurally barred.  (Lodgment 8, ECF No. 15-8 at 2.)  The Superior Court went on to review Robinson's claims on the merits and concluded that, even assuming the claims were not procedurally barred, he would not be entitled to relief because he failed to provide documentary evidence sufficient to make a showing of ineffective assistance of counsel.  (*See id.* at 2–4.)

On December 21, 2017, Robinson filed a petition for writ of habeas corpus with the California Court of Appeal, alleging retained counsel was ineffective in failing to fully investigate the circumstances of his confession, failing to raise the issue of his prolonged detention, and failing to adequately advise him of the consequences of his guilty plea.  (*See* Lodgment 9, ECF No. 15-9 at 14; *see also* Lodgment 10, ECF No. 15-10 at 1.)  On December 28, 2017, the California Court of Appeal denied Petitioner's petition on the merits, stating that Petitioner had failed to provide documentary evidence sufficient to support his claims of ineffective assistance of counsel.  (Lodgment 10, ECF No. 15-10 at 2.)

Robinson filed a petition for writ of habeas corpus in the California Supreme Court on April 30, 2018.  (Lodgment No. 11, ECF No. 15-11.)  In it, he argued that he received

ineffective assistance of counsel because counsel failed to adequately argue his confession should be suppressed and failed to properly advise him regarding pleading guilty.  (*See id.* at 18–32.)  On August 15, 2018, the court denied the petition without comment or citation.  (Lodgment No. 12, ECF No. 15-12.)

On February 25, 2019, Robinson filed the instant federal petition for writ of habeas corpus.  Respondent filed an Answer and Memorandum of Points and Authorities on August 16, 2019.  ("Answer," ECF No. 14.)  On September 16, 2019, Robinson filed his Traverse.  ("Traverse," ECF No. 18.)

## IV.   SCOPE OF REVIEW

Robinson's Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *See Lindh v. Murphy*, 521 U.S. 320 (1997).  Under AEDPA, a habeas petition will not be granted unless that adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding.  28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002).

A federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable.  *See Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004).  In order to grant relief under § 2254(d)(2), a federal court "must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record."  *See Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004).

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts.  *See Bell v. Cone*, 535 U.S. 685, 694 (2002).  The court may grant

relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case. *Id*. Additionally, the "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable." *See Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams v. Taylor*, 529 U.S. 362, 411 (2000). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision and presumes it provides the basis for the higher court's denial of a claim or claims. *See Ylst v. Nunnemaker*, 501 U.S. 797, 805–06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by *Andrade*, 538 U.S. at 75–76); *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). However, a state court need not cite Supreme Court precedent when resolving a habeas corpus claim. *See Early*, 537 U.S. at 8. "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" *id*., the state court decision will not be "contrary to" clearly established federal law. *Id*. Clearly established federal law, for purposes of § 2254(d), means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Andrade*, 538 U.S. at 72.

## V.    DISCUSSION

In his Petition, Robinson raises two grounds for relief.  In both, he argues he received ineffective assistance of counsel in violation of his Sixth Amendment rights.  In ground one, he contends counsel was ineffective in failing adequately argue his confession should be suppressed.  (*See* Pet. at 24–35.)  In ground two, Robinson claims defense counsel was ineffective in failing to properly advise him regarding his guilty plea.  (*See id.* at 35–46.) Respondent argues Robinson is not entitled to habeas relief because the state court's denial of his claims was neither contrary to, nor an unreasonable application of, clearly established law.  (*See* Answer at 15–24.)

### A.    *Motion to Suppress Confession*

In ground one, Robinson argues that defense counsel failed to properly investigate the circumstances of his confession and failed to adequately argue that it should be suppressed under *Miranda* and the Due Process Clause of the U.S. Constitution.  (*See* Pet. at 24–35.)  Petitioner raised this claim in his petition for writ of habeas corpus to the California Supreme Court, which was denied without comment.  (*See* Lodgment No. 11, ECF No. 15-11, Lodgment No. 12, ECF No. 15-12.)  This Court therefore "looks through" to the last reasoned state court decision to address Robinson's claim, that of the California Court of Appeal.  *See Ylst*, 501 U.S. at 805–06.   The appellate court denied the claim, stating in relevant part:

> In his writ petition, Robinson now claims his counsel was ineffective by failing to fully investigate the circumstances of his confession, resulting in a denial of a motion to suppress that confession.
>
> . . . .
>
> To establish ineffective assistance of counsel, Robinson must demonstrate deficient performance and prejudice under an objective standard of reasonable probability of an adverse effect on the outcome.  (*People v. Waidla* (2000) 22 Cal.4th 690, 718.)  A petitioner seeking habeas corpus relief bears a heavy burden to plead and prove sufficient grounds for relief.  (*People v. Duvall* (1995) 9 Cal.4th 464, 474.)  "At the pleading stage, the petition must state a prima facie case for relief.  To that end, the petition 'should both (i)

state fully and with particularity the facts on which relief is sought [citations], as well as (ii) include copies of reasonably available documentary evidence supporting the claim, including pertinent portions of trial transcripts and affidavits or declarations.'" (*In re Martinez* (2009) 46 Cal.4th 945, 955–56.) Conclusory allegations made without any explanation of their factual bases are insufficient to state a prima facie case or warrant an evidentiary hearing. (*People v. Duvall*, *supra*, at p. 474.)

In regard to his claim involving the motion to suppress his confession, Robinson provides no documentary evidence to support his claims beyond a copy of the motion to suppress his confession filed by counsel and the district attorney's opposition.  Likewise, he provides no explanation of the precise evidence his counsel would have discovered to support his motion to suppress that was not already included in the filed motion.  To establish ineffective assistance of counsel for failure to investigate potential evidence, a petitioner "must establish the nature and relevance of the evidence that counsel failed to present or discover."  (*People v. Williams* (1988) 44 Cal.3d 883, 937.) Robinson provides no explanation of any evidence his counsel should have found that, if added to the motion to suppress, would more likely than not have resulted in a different outcome.

(Lodgment No. 10, ECF No. 14-10 at 1–2.)

### 1.   Clearly Established Law

The Supreme Court has held that to establish ineffective assistance of counsel, a petitioner must first show his attorney's representation fell below an objective standard of reasonableness.  *Strickland v. Washington*, 466 U.S. 668, 688 (1984).  "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687.

Petitioner must also show he was prejudiced by counsel's errors.  *Id*. at 694. Prejudice can be demonstrated by a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id*.; *see also Fretwell v. Lockhart*, 506 U.S. 364, 372 (1993).  "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112 (citing *Strickland*, 466 U.S. at 693)  The Court need not address both the deficiency

prong and the prejudice prong if the defendant fails to make a sufficient showing of either one. *Id.* at 697.

There is a "strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." *Id.* at 686-87. "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "Representation is constitutionally ineffective only if it 'so undermined the proper functioning of the adversarial process' that the defendant was denied a fair trial." *Strickland*, 466 U.S. at 687.

Under the standards of both 28 U.S.C. § 2254(d) and *Strickland*, judicial review is "'highly deferential' and when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105 (citations omitted). As a result, "the question [under § 2254(d)] is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id*. The *Strickland* prejudice analysis is complete in itself and there is no need for an additional harmless error review under *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). *See Musladin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009) ("[W]here a habeas petition governed by AEDPA alleges ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984), we apply *Strickland*'s prejudice standard and do not engage in a separate analysis applying the *Brecht* standard.").

### 2.   *Miranda*

First, Robinson argues defense counsel failed to properly argue his confession should be suppressed under *Miranda*. (*See* Pet. at 24–30.) The Fifth Amendment right against self-incrimination requires the exclusion of statements elicited in a custodial interrogation unless the suspect was first issued warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436, 444–45 (1966). *Miranda* and its progeny govern the admissibility of statements made during custodial interrogation in both state and federal courts. *See id*. *Miranda* safeguards are required when a suspect is (1) "in custody" and (2) subject to "interrogation" by the government. *Miranda*, 384 U.S. at 444. A suspect is in custody when "there is a 'formal arrest or restraint on freedom of movement' of the degree

associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam)).  An "interrogation" includes both express questioning and its "functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).  This includes any words or actions that an officer could reasonably have foreseen would "elicit an incriminating response."  *Id.*; *see also Pennsylvania v. Muniz*, 496 U.S. 582, 600–01 (1990) (plurality opinion).

When a suspect has not formally been taken into police custody, a suspect is nevertheless considered "in custody" for purposes of *Miranda* if the suspect has been "deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444.  To determine whether the suspect was in custody, courts must first examine the totality of the circumstances surrounding the interrogation. *See Thompson v. Keohane*, 516 U.S. 99, 112 (1995).  Then the court must ask whether a reasonable person in those circumstances would "have felt he or she was not at liberty to terminate the interrogation and leave." *Id.*; *see also Berkemer v. McCarty*, 468 U.S. 420, 442 & n.35 (1984).

Here, Robinson's defense counsel filed a motion to suppress his confession. (*See* Lodgment No. 11, ECF No. 15-11, Ex. D at 49–54.)  In it, counsel argued Robinson's August 29, 2013 statement to Detective Shephard was obtained in violation of *Miranda* because Robinson was "in custody" when he provided the statement. (*See id.* at 50–54.)  Specifically, defense counsel asserted that, despite being told the interview was voluntary, the atmosphere of the interview suggested a reasonable person in Robinson's position would not have felt free to leave. (*Id.* at 52–53.)  Defense counsel argued that, as a result, Robinson was effectively "in custody" under *Miranda*. (*Id.*)  Defense counsel's argument was not unreasonable. *See Strickland*, 466 U.S. at 687.

Furthermore, even assuming arguendo that defense counsel's performance was deficient, Robinson cannot establish prejudice.  In order to establish prejudice with regard to a motion to suppress, Robinson must show that had counsel performed reasonably, there is a "reasonable probability that the evidence would have been suppressed, and the outcome of the trial would have been different." *See Lowry v. Lewis*, 21 F.3d 344, 346–47 (9th Cir.

1994).  The transcript of Robinson's August 29, 2013 interview with Detective Shephard makes clear that there is no reasonable probability any motion to suppress based on *Miranda* would have been successful because Detective Shephard specifically informed Robinson he was not under arrest and that he was free to terminate the interview at any time.  For instance, at the outset of the interview, the following exchange took place:

| | |
|---|---|
| [SHEPHARD]: | …Okay.  So, um, the first thing that, uh, I want to make sure that you know, Elroy, is that you are not under arrest. You have not been charged with any crimes at this point. Do you understand that? |
| [ROBINSON]: | Yes, sir. |
| [SHEPHARD]: | Okay.  Your presence here was based off of a request that I had called your wife yesterday. . . |
| [ROBINSON]: | Yes, sir. |
| [SHEPHARD]: | . . .and I had told her and informed her that your three children had been removed from your home and taken into protective custody. |
| [ROBINSON]: | Yes, sir. |
| [SHEPHARD]: | At that time, your wife wanted to meet with me and talk with me and I explained to her that if she wanted to come down today at 8 o'clock in the morning, that you guys are welcome to come talk with me if you want, and my understanding is that somehow she talked to you about that. . . |
| [ROBINSON]: | Yes, sir. |
| [SHEPHARD]: | . . . and that you agreed to come down here at 8 o'clock. |
| [ROBINSON]: | Yes, sir. |
| [SHEPHARD]: | Is that correct? |
| [ROBINSON]: | That is correct. |

1

2    [SHEPHARD]:    Did anyone force you to come down here to the police

3                 department today?

4    [ROBINSON]:    No.

5    [SHEPHARD]:    Did anybody order you to come down to the police

6                 department today?

7    [ROBINSON]:    No.

8    [SHEPHARD]:    So your command did not order you to come down here

9                 today?

10    [ROBINSON]:    No they didn't.

11

12    [SHEPHARD]:    Okay.  With that said, I want you to understand that you

13                 are not in custody.  You're not under arrest, which means

14                 you don't have to be here.  Okay?  If you want to leave a

15                 any time, you can leave, okay?  These doors are not
                  locked.  You, you saw the lobby and you can walk out at
                  any time that you want.  Do you understand that?

16    [ROBINSON]:    Yes, sir.

17

18    [SHEPHARD]:    Okay.  I don't want you to feel at any point that you're,

19                 you're stuck here or that you're not allowed to leave or
                  anything like that.  You are a free man.  You get to do

20                 whatever you want just like anybody else.  Do you

21                 understand that?

22    [ROBINSON]:    Yes, sir.

23    [SHEPHARD]:    Okay.  Uh, with that said, as I'm asking you questions,

24                 which is what I'm going to do today, is I want to talk to

25                 you.  If there are questions that you don't want to answer,
                  you don't have to answer 'em either.  Okay?

26    [ROBINSON]:    Yes, sir.

27

28    [SHEPHARD]:    You have the right not to talk or answer any questions if

you don't want to, okay?  That's your right as a person, as a free person.

[ROBINSON]:    Yes, sir.

[SHEPHARD]:    Okay?  Do you understand that?

[ROBINSON]:    I understand.

[SHEPHARD]:    Alright.   Understanding everything that I told you just now, uh, is it your will to want to talk with me today?

[ROBINSON]:    Yes, sir.

(*See* Pet., ECF No. 1, Ex. D at 65–67.)  Based on the interview transcript, it is clear Robinson understood he was not "in custody" at the time of the interview and was free to terminate the questioning and leave if he so chose.  *See Berkemer*, 468 U.S. at 442; *see also Lowry*, 21 F.3d at 346–47.  As such, Petitioner cannot establish prejudice because there was no reasonable probability that the motion to suppress his confession would have been granted.  *See Richter*, 562 U.S. at 112; *Strickland*, 466 U.S. at 694.

### 3.   Due Process

Robinson's argument that defense counsel inadequately investigated and argued his confession was coerced, in violation of the Due Process Clause, fails for similar reasons.  Under the Due Process Clause, confessions must be voluntarily.  *See Lego v. Twomey*, 404 U.S. 477, 483–85 (1972).  A confession is considered voluntary if it is "product of a rational intellect and a free will."  *Medeiros v. Shimoda*, 889 F.2d 819, 823 (9th Cir. 1989).  The Court must evaluate the totality of circumstances to determine whether "the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne."  *Beaty v. Stewart*, 303 F.3d 975, 992 (9th Cir. 2002); *see also Dickerson v. United States*, 530 U.S. 428, 434 (2000).

In determining whether the defendant's will was overborne by the circumstances surrounding a confession, the inquiry "takes into consideration . . . both the characteristics of the accused and the details of the interrogation." *United States v. Preston*, 751 F.3d 1008, 1016 (9th Cir. 2014) (en banc) (quoting *Dickerson v. United States*, 530 U.S. 428, 434 (2000)). The question in cases involving psychological coercion "is whether [in light of the totality of the circumstances] the defendant's will was overborne when the defendant confessed." *United States v. Miller*, 984 F.2d 1028, 1031 (9th Cir. 1993). More specifically, courts consider the following factors: the age of the accused, his intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep. *United States v. Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003).

The interrogation techniques of the officer must be "the kind of misbehavior that so shocks the sensibilities of civilized society as to warrant a federal intrusion into the criminal processes of the States." *Moran v. Burbine*, 475 U.S. 412, 433–34 (1986). The Supreme Court has required a high level of coercion to render a confession involuntary. *See Mincey v. Arizona*, 437 U.S. 385 (1978).

Here, Robinson argues his counsel was ineffective in failing to investigate and interview witnesses to establish his confession was involuntary and the result of "psychological duress." (*See* Pet. at 28–29.) He further claims his confession was the result of "duress and improper inducement through a third party" because "Detective Shephard made an appointment with my wife and told me through her that I must come in and speak with him." (*Id.* at 29.) He also contends he "felt obligated to obey the commands of Commander Baxter," his commanding officer, who purportedly urged Petitioner to cooperate with detectives. (*Id.* at 54–55.)

Even presuming for the sake of argument that Commander Baxter or Petitioner's wife were somehow working in concert with Detective Shephard to obtain inculpatory statements from Robinson, the interview techniques used by Detective Shephard do not

shock the conscience and the circumstances of the interrogation do not suggest that Robinson was coerced or his will overborne. As discussed above, there is nothing in the record to suggest that Detective Shephard threatened or forced Robinson to make a statement. Moreover, Robinson specifically stated that no one, including his commanding officer, had ordered him to participate in the interview. (*See* Lodgment No. 11, ECF No. 15-11 at 77.) He repeatedly affirmed that he voluntarily agreed to the interview. (*See id.*) Finally, review of the transcript of the entire interview indicates that, while at times stern, Detective Shepard's questioning of Robinson was generally cordial. (*See id.* at 76–116.) There was no threatening language or pressure from Detective Shephard, Robinson expressed no discomfort during the questioning, the interview took place during business hours, and there is no evidence it lasted longer than a few hours. (*See id.*)

Robinson fails to provide any evidence that the interrogation techniques of the Detective Shephard involved "the kind of misbehavior that so shocks the sensibilities of civilized society." *See Moran v. Burbine*, 475 U.S. 412, 433–34 (1986). Indeed, nothing in the state court record suggests anything near the high level of coercion required to render a confession involuntary. *See e.g. Mincey v. Arizona*, 437 U.S. 385 (1978) (finding a confession to be involuntary where defendant, while hospitalized and sedated in intensive care, was interrogated for four hours); *Greenwald v. Wisconsin*, 390 U.S. 519 (1968) (finding a confession to be involuntary where a medicated defendant was questioned for over eighteen hours and was deprived of food and sleep); *Beecher v. Alabama*, 389 U.S. 35 (1967) (finding a confession to be involuntary where police officers held a gun to defendant's head).

Finally, Robinson argues defense counsel failed to adequately investigate the circumstances surrounding his confession. Petitioner contends that, had counsel done a proper investigation, he would have learned that Commander Baxter had acted with law enforcement to coerce him into giving a statement to Detective Shephard. Defense counsel has a duty to conduct reasonable investigations or to make a reasonable decision that investigation is unnecessary. *Strickland*, 466 U.S. at 691. A decision not to investigate

must be assessed for reasonableness under the circumstances at the time, applying a "heavy measure of deference to counsel's judgments." *Wiggins v. Smith*, 539 U.S. 510, 521–22 (2003) (quoting *Strickland*, 466 U.S. at 690–91). Here, Robison offers nothing more that his self-serving conclusory allegation that, had defense counsel investigated and interviewed Commander Baxter more thoroughly, he would have provided information helpful to his motion to suppress. Furthermore, even assuming defense counsel had done the investigation Robinson alleges was lacking, he cannot establish prejudice because, as discussed above, Detective Shephard interrogation was not coercive, and Robinson has pointed to nothing Commander Baxter might have told defense counsel to alter that conclusion. *See James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) (stating conclusory allegations unsupported by specific factual allegations do not warrant habeas relief).

### 4.   Conclusion

In sum, for the reasons discussed above, Robinson has not established defense counsel was ineffective in investigating and arguing his motion to suppress his confession under *Miranda* and the Due Process Clause. Thus, the state court's denial of Robinson's ground one was neither contrary to, nor an unreasonable application of, clearly established law. 28 U.S.C. § 2254 (d)(1); *Williams*, 423 U.S. at 412–13. Ground one is **DENIED**.

## B.   *Plea Advice*

In ground two, Robinson claims he received ineffective assistance of counsel when his defense attorney "withheld vital information" and gave him "erroneous advice" regarding his guilty plea. (*See* Pet. at 35.) Petitioner raised this claim in his petition for habeas corpus to the California Supreme Court. (Lodgment No. 11, ECF No. 14-11 at 25–30.) The court denied the petition without comment or citation. (Lodgment No. 12, ECF No. 14-12.) This Court therefore looks through to the last reasoned state court decision. *See Ylst*, 501 U.S. at 805–06. The appellate court denied the claim, stating:

> [Robinson] also contends his counsel was ineffective by failing to fully apprise him of the consequences of his guilty plea.

> . . . .

1

2        [Robinson] provides no documentary evidence regarding the entry of

3    his guilty plea or the advice given by counsel.  He does not provide a copy of
     his change of plea form or the reporter's transcript of the entry of his plea,

4    both of which would provide some detail regarding the advice given by

5    counsel and the court's determination of whether the plea was entered
     voluntarily and knowingly.  A petitioner's assertion that he would not have

6    pleaded guilty if he received effective representation is not sufficient to

7    establish prejudice'; there must be some objective showing.  (See, e.g., *In re
     Vargas* (2000) 83 Cal. App. 4th 1125, 1140.)  Again, Robinson makes no such

8    showing here.

9    (Lodgment No. 10, ECF No. 14-10 at 1, 2.)

10       The decision of whether or not to accept a plea offer is a critical stage of the

11   prosecution at which the Sixth Amendment right to counsel attaches.  *Turner v. Calderon*,

12   281 F.3d 851, 879 (9th Cir. 2002).  Therefore, the two-part test of *Strickland* applies to

13   counsel's ineffective assistance in advising a defendant to accept or reject a plea offer.  *See*

14   *Hill v. Lockhart*, 474 U.S. 52, 57–58 (1985); *Nunes v. Mueller*, 350 F.3d 1045, 1051–53

15   (9th Cir. 2003) (rejecting attempt to limit *Hill* to acceptance of plea offer).  In light of the

16   complexity and uncertainties that attend plea bargaining, it is especially essential that the

17   habeas court respect the latitude for counsel's judgment that *Strickland* requires.  *See*

18   *Premo v. Moore*, 562 U.S. 115, 124 (2011) (holding that Ninth Circuit erred in concluding

19   trial counsel engaged in deficient performance by not moving to exclude a confession

20   before advising client to take a plea bargain early in the proceedings).

21       First, Robinson provides no support for his assertions and as such cannot establish

22   that counsel's performance fell below an objectively reasonable standard.  In his Petition,

23   Robinson merely states that defense counsel failed to properly advise him prior to pleading

24   guilty.  Such conclusory allegations are insufficient to establish federal habeas relief.

25   *James*, 24 F.3d at 26; *see also Jones v. Gomez*, 66 F.3d 199, 204–05 (9th Cir. 1995) (finding

26   conclusory allegations with no reference to the record are insufficient to support habeas

27   relief).

28       Second, Robinson's claim that counsel improperly advised and pressured him into

accepting the plea agreement is belied by the record.  "Solemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible."  *Blackledge v. Allison,* 431 U.S. 63, 74 (1977) (citing *Machibroda v. United States,* 368 U.S. 487, 495–96 (1962)).  Before entering his plea, Robinson signed the change of plea form under penalty of perjury, in which he attested:  "I have not been induced to enter this plea by any promise or representation of any kind except [a] stipulated [sentencing] range of 24 to 30 years to be determined by [the] sentencing court." (*See* Lodgment No. 11, ECF No. 14-11, Ex. L at 167.)  Robinson also specifically acknowledged his attorney had explained all the additional possible consequences of his plea.  (*Id.* at 168.)   Finally, he indicated that he understood he was waiving his right to appeal his sentence or any pretrial motion to suppress evidence under California Penal Code section 1538.5.  (*Id.*)  In sum, Robinson has failed to present evidence to overcome the presumption of verity given his signed and initialed change of plea form.  *See Blackledge*, 431 U.S. at 74.  Robinson therefore cannot prevail on his claim that his attorney was ineffective in advising him to accept the plea agreement.  *See Premo*, 562 U.S. at 124; *Strickland*, 466 U.S. at 686–87.

Moreover, even assuming counsel's performance was deficient, Robinson cannot establish prejudice.  The prejudice requirement "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process."  *Hill*, 474 U.S. at 59–60.  Petitioner must show that there is a "reasonable probability that, but for counsel's error, he would not have pleaded guilty and would have insisted on going to trial."  *Id.*; *see also Blackledge*, 431 U.S. at 73–74; *Muth v. Fondren*, 676 F.3d 815, 821 (9th Cir. 2012) (finding petitioner's statements at the "plea colloquy carr[ied] a strong presumption of the truth").

Given Robinson's lengthy and detailed confession (*see* Lodgment No. 11, ECF No. 15-11, Ex. F at 75–117), there is no reasonable likelihood that, had he refused to plead guilty and insisted on going to trial, he would have been acquitted, or if convicted, would

have received a shorter sentence. *See Hill*, 474 U.S. at 59 (holding that there is no prejudice in cases where assuming the defendant had not taken the advice to plead guilty, the likelihood remains low that the trial or sentencing outcome would have changed).   In addition, Robinson was originally charged with nine counts and, had he been convicted on all counts, faced well over 50 years-to-life in prison.[3]   (*See* Lodgment No. 1, ECF No. 15-1 at 1–2.)   Thus, in light of the strong evidence against him, Robinson has failed to demonstrate that, but for counsel's alleged deficiency, he would not have pleaded guilty and would have insisted on going to trial.  *See Hill*, 474 U.S. at 59; *see Richter*, 562 U.S. at 112 ("The likelihood of a different result must be substantial, not just conceivable.").

Therefore, based on the foregoing, the state court's denial of Robinson's claim that defense counsel failed to properly advise him regarding his guilty plea was neither contrary to, nor an unreasonable application of, clearly established law.  28 U.S.C. § 2254(d)(1); *Williams*, 423 U.S. at 412–13.  Therefore, claim two is **DENIED**.

## VI.   CERTIFICATE OF APPEALABILITY

Under AEDPA, a state prisoner seeking to appeal a district court's denial of a habeas petition must obtain a certificate of appealability.  28 U.S.C. § 2253(c)(1)(A).  The district court may issue a certificate of appealability if the petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  To satisfy this standard, a petitioner must show that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny a certificate of appealability.  *See* Rules Governing § 2254 Cases, Rule 11(a).  The Ninth Circuit has noted that the standard for granting a certificate of appealability is "relatively low."  *Jennings v.*

---

[3] As for counts one, two and five, that were dismissed under the plea agreement, Robinson faced a maximum sentence of 25 years-to-life on count one and 15 years-to-life on count two and 3 years on count five.  (*See* Lodgment No. 1, ECF No. 15-1 at 1.)

*Woodford*, 290 F.3d 1006, 1010 (9th Cir. 2002).    A petitioner "need not show that he should prevail on the merits," *Lambright v. Stewart*, 220 F.3d 1022, 1025 (9th Cir. 2000), but may be entitled to a certificate when the "questions are adequate to deserve encouragement to proceed further." *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983), *superseded on other grounds by* 28 U.S.C. § 2253(c)(2).  Here, Petitioner has failed to make "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and reasonable jurists would not find debatable this Court's assessment of Petitioner's claims that he received ineffective assistance of counsel.  *See Slack*, 529 U.S. at 484. Accordingly, a certificate of appealability is **DENIED**.

## VII.   CONCLUSION

Based on the foregoing, the Court **DENIES** the petition for writ of habeas corpus, **DENIES** a certificate of appealability.

**IT IS SO ORDERED.**

**DATED: May 18, 2020**

Hon. Cynthia Bashant
United States District Judge

3:19-cv-0387-BAS-MSB